[Criminal No. 400.  Filed May 19, 1917.]

[165 Pac. 326.]

## WALTER HILL and PETER W. DUNCAN, Appellants, v. STATE, Respondent.

1. INTOXICATING LIQUORS—SALES—PERSONS LIABLE.—In a prosecution for selling intoxicating liquors brought against the president of a corporation and its manager, where the president actually sold the liquor and the manager, although not present at the sale, prepared the invoice therefor in the usual course of business on information received from the buyer, and left the invoice on the desk of the shipping clerk for his attention, such acts did not constitute advising or encouraging the commission of the offense within Penal Code of 1913, section 27.

2. INTOXICATING LIQUORS—PROSECUTIONS—INTENT.—Where defendant, prosecuted for selling intoxicating liquors, knew that he was selling the identical cider in question, made a price therefor, and received payment accordingly, and caused the identical cider to be delivered, he cannot claim that he did not know that such liquor was intoxicating under Penal Code of 1913, section 24, subdivision 4, excepting from punishment persons who committed the act or made the omission charged under an ignorance or mistake of fact disproving criminal intent.

3. CRIMINAL LAW—SIMILAR SALES OF LIQUOR—EVIDENCE.—In a prosecution for selling cider found to be intoxicating, evidence that defendant had, at prior times, made similar sales was properly admissible to show intent, and that the cider was sold in the usual course of business.

   [As to evidence of other offenses, and when admissible, see notes in 44 Am. Rep. 299; 105 Am. St. Rep. 976.]

4. CRIMINAL LAW—REVIEW—PRESERVATION OF EXCEPTIONS.—Appellants, in a criminal prosecution cannot complain of testimony to

which no objection is interposed, either at the time it is given or by motion to strike.

5. CRIMINAL LAW—REVIEW—HARMLESS ERROR.—In a prosecution for selling cider which was subsequently found to be intoxicating, the admission of evidence that a purchaser thereof was convicted and fined for selling intoxicating liquor *held* harmless.

APPEAL from a judgment of the Superior Court of the county of Maricopa. R. C. Stanford, Judge. Affirmed in part; reversed in part.

Messrs. Armstrong & Lewis and Mr. Charles B. Ward, for Appellants.

Mr. Wiley E. Jones, Attorney General, and Mr. R. Wm. Kramer and Mr. Geo. W. Harben, Assistant Attorneys General, for the State.

CUNNINGHAM, J.—The appellants are charged with having sold intoxicating cider to I. E. Troutner, at Phoenix, Arizona, on July 16, 1915.

The appellant Walter Hill, as a witness in behalf of the defendants, according to the abstract of record, testified with regard to his connection with the alleged sale of intoxicating liquor as follows:

"I am president of the Walter Hill Company. It is engaged in the wholesale business, produce, fruits, candies, fountain supplies, and summer drinks; by fountain supplies I mean cocoa, chocolate, cider, grape juice, Coca-Cola—soft drinks. I have distributing houses at Ray, Mesa, and Prescott and Phoenix, Arizona, and Los Angeles, California. I am general manager of all branches, and have direct control of the affairs of the corporation. I know I. E. Troutner. I first saw him the latter part of June, about the 20th, in my office. He came in to inquire about cider. I told him we had two kinds of cider; one made by Barrett & Barrett of Chicago, and another by Lewis & Leech of Denver. I made him prices, Denver cider 70 or 75 cents. I had some cider in stock at that time; I think it was in 28-gallon barrels. He made no purchase at that time. According to the records he made his first purchase June 26th. I can't say just how much he purchased then; I think he talked with me three different occasions about cider. The first shipment I re-

ceived from Lewis & Leech came the middle of June; I think
he bought two kegs on June 26th. His next purchase was
on July 1st, three 28-gallon barrels. On July 2d he pur-
chased some more. On June 27th we held up his order on
account we read in the papers about bulldog cider. I didn't
know what bulldog cider was until I talked to Mr. Brisbois,
and then went back to the store and got a bottle of Lewis &
Leech cider and took it over to Mr. Gandy. I gave it to
Mr. Gandy [the county attorney]. . . . About four days
after going to the district attorney's office I made a test of
the cider by drinking some of it. In the meantime I didn't
sell any. Mr. Troutner, Mr. Hill [an employee of the same
company], and the bookkeeper were present. Mr. Troutner
poured it out of one of the kegs purchased from Lewis &
Leech, being the same brand of cider sold to Troutner on
July 16th. I have dealt in cider here in Phoenix only about
a year; I made cider in Canada. This cider that I drank
was sweet cider. After making this test I made a second
sale to Troutner on July 1st. I next had a talk with Mr.
Troutner in the afternoon of July 7th. He came in the store
while I was getting ready to leave for California. I was in
a hurry to get up home. He said he was selling lots of cider,
and he wanted me to make him a better price on the Denver
cider. I told him I would make it 70 cents in 50-gallon kegs.
He ordered five barrels, and said he was in a hurry for them.
I told him I would wire, which we did. I didn't tell him
we were receiving weekly shipments. I went to California
the next morning and returned on September 13th. This
was the same cider we drank and tested on the 7th. Between
the 7th day of July and the 13th day of September I per-
sonally had nothing to do with the sales, deliveries, or collec-
tions of money for sales of cider, but of the Walter Hill Com-
pany House. I received no money for cider on July 7th, and
I made no entries in the books of any sale. . . . The cider
which I sold Mr Troutner was pure apple cider and non-
intoxicating beverage. I never sold any alcoholic liquor of
any kind to any person to my knowledge.''

On cross-examination the witness explained that the test
made by drinking the cider was that he drank a cupful, that
would hold a big wineglass.

Defendant Duncan testified that he was employed by the
Walter Hill Company during June and July as manager.

"I oversee the business and do the buying and selling. We handled cider shipped from Denver. . . . The Lewis & Leech cider was branded 'Pure Apple Cider'; I knew Troutner. I had a business transaction with him on June 26th. He purchased some cider at that time and paid me for it. On July 10th he got some more cider. He didn't buy any cider from me on the 16th. The first I learned there had been cider ordered from Denver was on July 12th. Mr. Troutner came in and wanted to know if his cider had come. Hill went away on July 7th. Troutner came in the store most every morning inquiring about his cider; he said Mr. Hill had ordered five barrels of cider for him. I was not present when Troutner got the cider on the 16th. . . ."

Witness went to California on July 16th and returned July 21st. On cross-examination witness stated that his initials are on the invoice as the salesman.

"I put them there; on the 16th he asked me if it was in; I had talked with him the day before."

P. L. Simpson, the shipping clerk for the Walter Hill Company, testified in behalf of the state that:

"I believe Mr. Hill is proprietor. Mr. Duncan is manager; Mr. Duncan has charge of the place during Hill's absence; . . . I know I. E. Troutner; I know he made purchases from the Walter Hill Company. He was buying cider from the company. The system or method used when purchases were made like Troutner's were made in the regular manner, were made on one of our bills, Walter Hill Company's bills; whoever takes an order makes out those bills; I have a distinct recollection of one particular time when Troutner made purchase. There was a check made in payment. I made out the check I think at the shipping clerk's desk. . . ."

Witness was here shown four invoices, which he recognized, and identified two of them as having been receipted by Duncan; one he did not know whose receipt it was, and one, receipted by himself. Witness receipted the invoice of July 16th. Said invoice is in the handwriting of Duncan and receipted by witness, and was first seen by witnesss lying on his desk. On cross-examination witness stated in explanation of the occasion of his having receipted the bill of invoice, as follows:

XIX Ariz.—6

"I happened to be the only one in the sales department at that time of the day, and I was collecting the money there just the same as I would for anything else that happened to be left there. When Mr. Troutner came up he said he wanted to pay this bill I have here. Then I wrote the check. I am not sure whether he gave it to me or whether it came from the office. The check is in my handwriting and he paid the bill to me; the bill for this cider was on the desk. If it was put there for me to collect the desk was the proper place. I find other bills there as shipping clerk for me to collect, not all of them, but in the ordinary course of business. There was nothing out of the way at all in this bill being laid there. Mr. Duncan was not there when I wrote the check for Mr. Troutner. He was not present when I was paid the money."

Here we have the story of the transaction as told by the employees of the Walter Hill Company from the incipiency of the transaction to the point of the actual delivery of the cider to Troutner's possession. The fact of delivery actually made to Troutner is not contested.

Walter Hill, the general manager of the Walter Hill Company, opened negotiations with Troutner to furnish him five barrels of Denver cider at 70 cents per gallon, for which Troutner agreed to pay upon delivery. Walter Hill wired to Denver for the cider, ordering its immediate shipment. This occurred on July 7th. Walter Hill left the state for the benefit of his health on the 8th of July. On the 12th of July, Troutner inquired of Mr. Duncan about the cider Mr. Hill had wired to Denver for, at Troutner's request. Duncan knew nothing of that occurrence before Troutner's inquiry. Having been informed of it by Troutner, and after Troutner had made daily inquiries of whether the cider had arrived, on July 16th Duncan made out the usual bill of invoice for the five barrels of cider to Troutner, at the price Hill had made to Troutner, placed the invoice on the shipping clerk's desk as a memorandum, and he, Duncan, on the same day left the state and did not return until July 21st. The system followed by the Walter Hill Company in making sales of cider was the same system followed in making sales of all other goods handled by it. When a sale had been made, a bill or invoice of the thing sold was usually, but not always, made out and furnished the shipping clerk. In this

instance, Peter W. Duncan made out the bill or invoice of the Troutner transaction and placed it on the shipping clerk's desk. He did this relying on the statements made to him by Troutner of Troutner's prior transaction with Walter Hill. Simpson, the shipping clerk, found the invoice on his desk, and Troutner offered to pay for the cider. Simpson's duty was to collect such bills, and he did receive the money offered by Troutner.

The relation of Hill and Duncan to the transaction in question is important to an understanding of the issues involved with regard to the liability of the parties.

"All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present have advised and encouraged its commission, . . . are principals in any crime so committed." Section 27, Penal Code 1913.

Mr. Hill arranged with Troutner all of the details of the transaction which finally resulted in transferring the five barrels of cider to him. Neither Duncan nor Simpson was present at this transaction. Mr. Simpson collected from Troutner the price Hill arranged for Troutner to pay for the cider. Neither Hill nor Duncan was present at the time of payment. Troutner received the cider, but from whom does not appear from the evidence. That neither Hill nor Duncan was present at the time of the delivery is clear. Simpson is not charged with the commission of the offense. He may have delivered the cider.

The part Mr. Hill took in the transaction was an essential step in the commission of the offense. The collection of the price and the delivery of the liquor are also essential to the completion of the transaction. That the transaction should be made in accordance with the plan and system adopted by the Walter Hill Company in making sales of goods handled by it was not essential to this transaction. Duncan was not present at the time any essential act of the transaction was committed by either Hill or Simpson. Duncan did not directly commit any act essential to the transaction constituting the offense. Not being present, did Duncan advise and encourage its commission, by simply preparing an invoice in the usual course of the business on information received from Troutner as to the terms and conditions prescribed by Mr.

Hill, and by leaving the invoice on the desk of the shipping clerk for that employee's attention? I think he did not as a matter of law advise and encourage the commission of the offense by the mere act of preparing a business record of a prior transaction had in his absence. Mr. Hill was the responsible person about the business of the Walter Hill Company. The witnesses who were employees of the company, including Walter Hill, in their testimony clearly indicate that Walter Hill was in fact and to all intents and purposes the dominant person, and the whole Walter Hill Company corporation. His orders in the business were final. They were executed by the other employees as orders of the corporation. Hill was president, general manager, and controlling director of the corporation, and holding such a powerful control over the business of the corporation the employees under him were simply engaged in executing his orders. Of course, Mr. Hill's orders to employees under him requiring such employees to sell or dispose of intoxicating liquors or do any other criminal act would not relieve the employee executing such orders from criminal liability. But Hill did not order Duncan to prepare the invoice of the Troutner purchase. Hill had evidently ordered the plan or system of making invoices of all sales made in the course of business by the employees making sales; but Hill made this sale in question and did not himself prepare the invoice of the transaction, nor directly order Duncan to prepare such invoice; whatever Duncan did in the matter, he did at the urgent insistence of Troutner. He had no opportunity to advise and encourage Hill in making the arrangement Hill did make with Troutner, and Simpson executed Hill's orders when the money was collected from Troutner. These facts and others in the evidence conclusively show that Duncan was not concerned in the commission of the offense charged either directly aiding and abetting or as one not being present advising and encouraging its commission. Consequently he was as a right entitled to a directed verdict of acquittal.

The appellants contend that they had no knowledge whatever that the cider involved was intoxicating, and as a consequence they cannot be held criminally liable for the act of selling it. That the sale was made under a mistake of fact, and that a lack of knowledge of the intoxicating character of the cider which was sold relieved from criminal liability.

They argue that in the absence of such knowledge the union or joint operation of act and intent requisite to every crime or public offense is likewise absent; also that the absence of such knowledge disproves any criminal intent within subdivision (4) of section 24 of the Penal Code of 1913. Said statute is as follows:

"All persons are capable of committing crimes except those belonging to the following classes: . . . (4) Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent."

The act here complained of as criminal was the transfer of the property right in and the possession of five barrels of cider of a designated name for a consideration paid therefor. No possible mistake of fact accompanied such transaction. Every circumstance in evidence surrounding the transaction excludes the idea of mistake or ignorance affecting the transaction. Every person concerned in the sale knew that the thing sold and intended to be sold and purchased and delivered was nothing other than five barrels of cider produced by Lewis & Leech of Denver, Colorado, and bearing the trade name of "Apple Queen Pure Cider." Every person concerned in the transaction, except the employee who delivered the goods to Troutner knew that the price fixed required to be paid, and which was paid, for the goods was 70 cents per gallon. Neither Hill nor Troutner intimate that they were ignorant or mistaken with regard to any of these facts. When a party sells a thing knowing that he is selling that identical thing, and makes a price therefor and receives payment accordingly, and causes the identical thing he intended to sell and nothing else to be delivered, he cannot claim that he did not know the nature of the article sold and delivered by him in excuse of a criminal charge for selling a prohibited article.

The questions here referred to have been heretofore considered by this court in *Troutner* v. *State*, 17 Ariz. 506, L. R. A. 1916D, 262, 154 Pac. 1048, and there decided against appellants' contention. The appellants concede the force of that decision, but they request that we re-examine the questions here, and present many arguments why that decision was wrong. I am entirely satisfied with the correctness of the Troutner decision, and adhere to the same. The conten-

tions made on this appeal now under discussion are dis-
allowed on the authority of the Troutner case, *supra.*

The state was permitted to give evidence of sales of cider
made by the Walter Hill Company, by Walter Hill as sales-
man, to Troutner, at times prior to the sixteenth day of July,
1915. These sales are not relied upon for a conviction in
this case, but the appellants complain of the ruling of the
court admitting evidence of such prior sales. I think the
evidence of such sales was admissible to show that the inten-
tion of the parties was to sell cider, and that the cider sold
on the sixteenth day of July, 1915, was sold in the usual
course of business and as an article of commerce handled by
the Walter Hill Company; that the employees of the com-
pany who participated in such sales knew what they were
doing, and that they knew that they were selling cider, carry-
ing out the plan of the business concern. No one connected
with this cause denies the fact that the prior sales were made
in the ordinary course of the business, but, on the other hand,
the appellants admit the sales were made and in the ordi-
nary course of the business. No criminal responsibility is
based upon any of such prior sales, and this is made clear
during the course of the trial. The evidence was admissible
for the purpose of showing the course or plan pursued by
the Walter Hill Company's employees in the matter of sell-
ing cider. Such evidence would seem to be of advantage to
the defendant's cause, rather than of a disadvantage. It
tended to show that the sale in question was one made in
the ordinary manner of making sales of cider, and was not
made in suspicious circumstances. At least it tends to re-
move the moral sting from the transaction, if it does not
remove the legal liability to punishment.

The court, over the objection of the appellants, admitted
evidence to the effect that certain persons who bought the
cider which the Walter Hill Company sold to Troutner on
the sixteenth day of July, 1915, were charged and convicted
of selling intoxicating liquor. Troutner was also permitted
to testify that he was convicted of selling the same cider he
bought July 16th from the Walter Hill Company. Such evi-
dence was received for the purpose of showing that the cider
bought by Troutner from the Walter Hill Company through
the appellants was intoxicating in character.

An expert witness on July 21st took a sample of the cider in question handled on July 16th and made a chemical analysis of it. He found it contained alcohol in volume of seven and one-fourth per cent. The evidence of the intoxicating character of the cider in question was not conflicting. Mr. Hill testified that he drank a cup full of the same brand of cider as a test, and gave as his opinion from his knowledge of cider that it was sweet cider. The cider he tasted was cider other than the cider Troutner bought on July 16th. There is no evidence in the record conflicting with the evidence produced by the prosecution tending to show that the cider bought by Troutner on the sixteenth day of July contained alcohol to the amount sufficient to intoxicate. The appellants produced some testimony other than that of Mr. Hill tending to show that the same brand of cider handled before the 16th of July was not intoxicating. As I understand the record of the testimony and the contention of the appellants as to the intoxicating character of the cider contained in the five barrels bought by Troutner on July 16th is that the cider was intoxicating. The appellants do not seriously contend on the trial nor on this appeal that such cider was not intoxicating, but their serious contention is that they had no knowledge of its intoxicating character when they sold it.

The testimony given by Troutner, Jack Gibson, and Byrd is attacked as having been erroneously admitted. Troutner, without objection, testified that his place of residence was at the county jail for selling cider the latter part of June and the first part of July, 1915. At the close of his examination in chief, in the absence of objection, he testified, according to the abstract of the record, as follows:

"Got into difficulty over this cider on account of intoxicating character of it; was arrested, tried, and sentenced."

At the close of the cross-examination he states:

" . . . On the trial that I was convicted for selling cider did not go on the stand or offer any evidence at all."

Jack Gibson was called as a witness following Troutner. On his direct examination he testified, without objection, that he "handled cider bought from Troutner; do not remember date; was arrested for selling cider bought from Troutner; think purchase was two barrels." The examination then turned upon another matter of taking samples of cider. A

cross-examination followed and closed. The prosecution thereupon asked the witness the following:

"Q. Did you get into any difficulties by selling this cider?"

Objected to as not redirect. Then offered as a question omitted on direct examination. To which the following objection was made:

"Mr. Armstrong: We don't care whether it is direct, or what it is. It is immaterial and irrelevant. We object on that ground. (Objection overruled.) A. Yes, sir; I got into trouble for selling this cider. Q. Were you arrested? A. Yes, sir. (Objected to for the same reason, and objection overruled.) Q. And was there any sentence passed upon you in any court for selling that cider? Mr. Armstrong: The same objection. A. I got fined $150 for selling it."

On cross-examination the witness testified that he pleaded guilty to the charge.

Then other witnesses were introduced by the state and examined and cross-examined after Jack Gibson retired from the witness-stand. Thereupon L. M. Byrd was introduced by the state. He testified without objection that he bought one 50-gallon barrel of cider from Troutner five days before witness was arrested and when witness was arrested he had a quantity of the cider on hand; "got into difficulty for selling that cider; got arrested for it; was sentenced by the court and paid $250." On cross-examination he testified that he "did not go on the stand or testify to a jury; plead guilty."

No objection was raised to the testimony of either of these witnesses upon the matters of their arrest. The only objection raised was to the testimony of Jack Gibson, and the only portion of Jack Gibson's testimony not already before the jury without objection was the answer to the question, to wit:

"Q. And was there any sentence passed upon you in any court for selling that cider?

"Mr. Armstrong: The same objection. A. I got fined $150 for selling it."

This answer is the only new testimony brought out by this witness. No motion was made to strike this answer, nor to strike the testimony of this witness theretofore given. The appellants cannot complain of the testimony given by Troutner, Gibson, and Byrd, to which they interposed no objec-

tion, either at the time it was given, or thereafter by moving to strike. The testimony given by Jack Gibson on his re-direct examination to which appellant objected is the only matter in this respect open to inquiry on this appeal. Had the court sustained the objections to the questions asked on redirect examination concerning witness' difficulties for sell-ing the cider, the statement that he had been arrested for selling the cider was still in the record, to which there was no objection. The objection to the new matter with regard to the fact that witness was fined for selling the cider is the question for consideration. Had this answer been excluded, leaving the former testimony of this witness and the testi-mony of witness Troutner with the subsequent testimony of witness Byrd in the record and before the jury, to which no objection was interposed, would the result have been any dif-ferent? Had all of this class of testimony been objected to and excluded, could the jury have reasonably reached a ver-dict any different from that which they have reached? It seems quite clear to me that, if the court had excluded Jack Gibson's answer to the questions, "Did you get into any diffi-culties by selling this cider?" and " . . . Was there any sen-tence passed upon you in any court for selling that cider?" the answer to the first question was that he did get into trouble, and the answer to the second question was, "I got fined $150 for selling it," leaving the other testimony in the case, to which no objection was made, no different verdict would have resulted. This class of evidence bears upon the intoxicating character of the cider, and could have no bear-ing upon any other feature of the case. All of the evidence other than the class of evidence now considered, before the jury without material conflict, is to the effect that the cider in question was an intoxicating liquor.

Without any doubt the matters of Gibson's arrest and fine for selling this cider had no place in the evidence in this case against Hill and Duncan, charged with selling the identical cider to Troutner. The same may be said of the testimony of Troutner and Byrd bearing upon the same matters. At the request of these appellants the court gave the jury the following instruction, to wit:

"The court instructs the jury that there has been evidence admitted in this cause of sales other than the one herein be-ing inquired into, and that you are not to render any verdict

against the defendants, or either of them, by reason of any such other sales. The only sale that is material in this case is the sale alleged to have been made on July 16, 1915.''

The appellants must have considered this instruction all-sufficient to meet the matter of sales made by Troutner, Gibson, and Byrd; if not, they would have requested other instructions more directly meeting their testimony. In the absence of a request for an instruction specially dealing with the sales made of the cider by the said three witnesses, the instruction given as requested must be deemed broad enough to sufficiently inform the jury of the law applicable to such and all sales mentioned in the testimony other than the sale of July 16, 1915.

The admission of the answers of Gibson as testimony against Hill and Duncan was a clear technical error in the proceedings. But upon a consideration of the whole case I am of the opinion that no prejudice could or did result therefrom, for the reason no fair conclusion can be reached from the evidence remaining in the case, excluding the objectionable testimony, other than that the cider sold to Troutner on July 16, 1915, was intoxicating liquor.

I have considered all of the questions raised by the appellants on this appeal, and deem the foregoing discussion sufficient to set forth the reasons for my decision without a further discussion of the other questions. I am therefore of the opinion that the appellant Hill has been awarded a fair and impartial trial, and that this record presents no reversible error as to said appellant.

I am of the further opinion that the evidence fails to connect Peter W. Duncan with the commission of the act constituting the offense. Consequently the judgment is reversed as to Peter W. Duncan, and remanded, with instructions to discharge this defendant.

The judgment as against Walter Hill is ordered affirmed.

FRANKLIN, C. J., and ROSS, J., concur.

On mistake in beverage as defense to charge of illegal sale of liquor, see notes in 6 L. R. A. (N. S.) 477; 21 L. R. A. (N. S.) 525; L. R. A. 1916D, 266.